IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Matthew Paul Emerson, | ) |
| | ) **ORDER DENYING PLAINTIFF'S** |
| Plaintiff, | ) **MOTION FOR SUMMARY** |
| | ) **JUDGMENT AND GRANTING** |
| | ) **DEFENDANT'S MOTION FOR** |
| vs. | ) **SUMMARY JUDGMENT** |
| | ) |
| Kilo Kijakazi, Acting Commissioner | ) Case No. 1:18-cr-146 |
| of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

Plaintiff Matthew Paul Emerson ("Emerson") seeks judicial review of the Social Security Commissioner's denial of his applications for Disability Insurance Benefits ("DIB") and under Title II of the Social Security Act and Supplemental Security Income Benefits ("SSI") under Title XIV of the Social Security Act. Before the court are motions for summary judgment filed by Emerson and the Commissioner of the Social Security Administration ("Commissioner"). For the reasons that follow, Emerson's motion is denied and the Commissioner's motion is granted.

## I.   BACKGROUND

### A.   General Background

Emerson has a history of panic disorder, generalized anxiety disorder, obsessive-compulsive disorder, major depressive disorder, and borderline personality disorder. (Doc. No. 10-7 at pp. 19-21; Doc. No 10-8 at pp. 3). He also suffers from degenerative disc disease, arthritis, and migraine headaches. (Doc. No. 10-8 at pp. 3). He has undergone fusions of his ankle, cervical vertebrae, and

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted as the defendant in this suit. See Fed. Fed. R. Civ. P. 25(d); see also 42 U.S.C. § 405(g) (stating an action survives "notwithstanding any change in th person occupying the office of the Commissioner of Social Security").

thoracic/lumbar spine.  (Id. at pp. 5-78).  He has at various times been prescribed Lexapro for anxiety, Imitrex and Topamax for his migraines, and oxycodone for his pain.  (Doc. No. 10-6 at p. 75).  Emerson's relevant work history includes employment as a forklift operator and shop foreman.  (Id. at p. 76).  He was 43 years old at time of his most recent administrative history.  (Doc. No. 10-2 at p. 38).

### B.     Procedural History

Emerson first applied for DIB and SSI on August 31, 2009, alleging an onset of disability date of March 1, 2009.  (Doc. No. 10-3 at pp. 114-127). His applications were initially denied on December 21, 2009.  (Id.).  His request for reconsideration was denied on March 26, 2010.  An Administrative Law Judge ("ALJ") convened a hearing, after which he issued an opinion denying the applications on September 19, 2011.  (Id.; Doc. No. 10-2 at pp. 65-11).  The Appeals Council denied Emerson's subsequent request for review and adopted the ALJ's opinion as the Commissioner's final decision on October 26, 2012.  (Doc. No. 10-3 at p. 25).

Emerson reapplied for DIB and SSI on May 11, 2015. (Doc. No. 10-5 at pp. 4-13).  He initially alleged an onset of disability date of March 1, 2011.  (Id.).  He later amended the alleged onset of disability date to September 20, 2011.  (Id. at p. 6).  His applications were again denied initially and upon reconsideration.

An ALJ convened an administrative hearing at Emerson's request on May 25, 2017.  (Doc. No. 10-2 at pp. 31-64).  At the outset of the hearing Emerson further amended his alleged onset of disability date to June 1, 2014.  (Id. at p. 35; Doc. No. 10-5 at p. 34).

On September 21, 2017, the ALJ issued a written opinion denying Emerson's applications for DIB and SSI.  (Doc. No. 10-2 at pp. 12-23).  The Appeals Counsel denied Emerson's subsequent

request for review and adopted the ALJ's opinion as the Commissioner's final decision. (Id. at pp. 2-11).

Emerson initiated the instant action pro se and in forma pauperis on July 12, 2018, seeking judicial review of the Commissioner's decision to deny his most recent applications pursuant to 42 U.S.C. § 405(g). (Docket Nos. 1, 3, 4). Emerson filed a Motion for Summary Judgment on December 20, 2018. (Docket No. 12). The Commissioner filed a combined Motion for Summary Judgment and response to Emerson's motion on March 5, 2019 (Doc. No. 18). Emerson filed a response to the Commissioner's motion on March 22, 2019). (Doc. No. 21).

### C.  Administrative Hearing

Two people testified at the administrative hearng on May 27, 2022: Emerson and a vocational expert.

#### 1.  Emerson's Testimony

At the outset of the hearing Emerson briefly discussed his recent work history. Specifically, he testified that he had been working a few hours per week at an after school program since applying for benefits. (Doc. No. 10-2 at p. 39-40). In response to queries from the ALJ, he testified briefly about his past work as a forklift operator at Cloverdale Foods and as a shop foreman at a salvage yard. (Id. at pp. 39, 41). He then segued into a discussion about his pain complains.

Emerson testified that he can no longer work due to chronic neck pain. (Id. at pp. 42-43). He added that his neck pain has adversely affected his ability to concentrate and has made it difficult for him to sleep. (Id.). When asked to rate his pain on scale of one to ten, he responded that it never gets better than a seven, even when taking the oxycodone that has been prescribed to him by his doctors. (Id. at p. 44). He further testified that his pain is exacerbated when lying down for

long periods of time (45 minutes to an hour) or when engaging in any activity that requires him to move his neck, that he cannot remain seated for more than 20 minutes before has to get up and move around, and it is nearly impossible for him to repeatedly lift anything much heavier than a coffee up from shoulder height on up.  (Id.).

In regard to his migraine headaches, Emerson testified that he gets them at least three to four times per week that, on a pain scale of one to ten, they are typically a five or six, and that they can last between one and eight hours.  (Id. at p. 45, 56).  He further testified that he has been prescribed Imitrex for his migraines but that it is not always effective and that, to district himself, he sometimes goes for a walk, reads, logs onto Facebook,  or watches a movie.  (Id. at pp. 45-46, 51).

In regard to his back, Emerson testified that his back tightens up after walking twenty to thirty minutes and that he can only stand in one place for fifteen minutes at a time.  (Id. at p. 47). He added that,  because of his back and neck pain, he cannot lift so much as a gallon of milk repeatedly.  (Id. at p. 47-48).

In regard to his lower extremities, Emerson testified that his balance is a "little off" and that he does not use ladders, does not jump, and avoids stairs as much as possible.  (Id.  at p. 48).  He further testified that, due to surgeries and resulting scar tissue, his left foot begins to  feel tender and uncomfortable after walking as little as three blocks and that he has been using, at his own initiative, a cane for a couple of years.   (Id. at p. 48-49, 56).

In regard to his mental health, Emerson testified that he suffers from both depression and anxiety and on occasion has experienced severe panic attacks.  (Id. at p. 52, 53).  He further testified that he has a service dog and takes Lexapro, both of which have helped.  (Id. at p. 53, 55-56).  When asked to elaborate on the frequency and intensity of his panic attacks, he testified that they seem to

come out of the blue and that he has what he considered to be a bad one every six months. (Doc. No. 54, 56).

When asked to address his pain as a whole and how it has affected his life, Emerson testified that, on a particularly bad day, there are few activities in which he can engage in for any meaningful length of time. He went on to testify that he cannot sit through an entire movie, has difficulty reading, and has pain radiating up his back that makes him feel sick. (Id. at p. 50-51).

### 2. Vocational Expert

When examining the vocational expert, the ALJ first inquired whether a hypothetical individual of Emerson's age, education, and vocational background could perform Emerson's past relevant work if he: (a) could lift/carry twenty pounds occasionally and ten pound frequently; (b) could sit up to six hours in an eight-hour workday; (c) could stand and walk up to four hours in an eight-hour workday; (d) could occasional climb ramps or stairs but never climb ladders, rope, or scaffolds, could occasionally, balance, stoop, knee, crouch, or crawl; and (e) was limited to simple routine tasks. (Id. at p. 58-59). The vocational expert responded that such an individual would be incapable of performing Emerson's past relevant work but would be capable of performing other sedentary, unskilled work. (Id. at p. 59). As examples of such work he listed the following jobs: an eyeglass frame assembler, a fishing reel assembler, and a toy and sporting equipment stuffer–that fell within this category. (Id.).

Second, the ALJ inquired whether the previously described hypothetical individual could still perform any work if he "would need to alternate positions every half hour in as much as they would need to move about for two to three minutes every half hour to remain on task." (Id. at pp. 59-60). The vocational expert responded that such an individual remained capable of performing a fewer

number of elemental industrial jobs. (Id. at p. 60).

Third, the ALJ inquired whether there was any work that the previously described hypothetical individual could perform if he was off task for more than one hour per day while he was dealing with symptoms related to anxiety and depression and the consequences of chronic pain. (Id.). The vocational expert responded that being off task for more than one-hour per day would preclude any employment. (Id.).

Fourth, the ALJ inquired whether it would change the analysis of the previously described hypothetical person if he required a cane to ambulate. (Id. at pp. 60-61). The vocational expert responded that such a requirement would not appreciably change things. (Id. at p. 61).

Finally, the ALJ asked the vocational expert to consider the previously described hypothetical individual and his prospective for competitive employment if he were absent, tardy, or needed to leave early at least two days per month on account of his physical and/or psychological conditions. (Id.). The ALJ responded that missing two days a month would rule out unskilled competitive employment. (Id.).

> **D.     ALJ's Decision**

Employing the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520, the ALJ concluded that Emerson was not disabled under the relevant sections of the Social Security Act. (Id.).

At steps one and two, the ALJ recognized that Emerson had not engaged in any substantial gainful activity since June 1, 2014, and suffered from the following severe impairments: status post ankle fusion; status post cervical fusion; status post lumbar/thoracic fusion; arthritis; depression with bipolar; and anxiety disorder. (Id. at p. 15). The ALJ also took note of Emerson's testimony

regarding his history of chronic migraines. (Id.). However, upon reviewing the record, the ALJ concluded that Emerson's migraines were well controlled with medication and had only minimally interfered with his ability to engage in basic work activities. (Id.).

At step three, the ALJ concluded that Emerson's impairments, although severe, did not alone or in combination meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. § 404, Subpart P, Appendix 1. (Id. at pp. 15-16).

At step four, ALJ determined that Emerson retained the residual functional capacity to lift and carry twenty pounds occasionally and 10 pounds frequently, stand or walk no more than 4 hours in an 8-hour day, and sit more than 6 hours in an 8-hour day. (Id. at p. 17). He further determined that Emerson would require a sit/stand option with the flexibility to alternate positions every half hour and move about for 2 to 3 minutes while remaining on task. (Id.). Finally, he determined that Emerson could never climb ladders, ropes, or scaffolds and only occasionally balance, stoop, kneel, crouch, crawl, or climb ramps or stairs. (Id.).

In making these determinations, the ALJ acknowledged that Emerson's medically determinable impairments could reasonably be expected to cause some of his alleged symptom. (Id.). The ALJ nevertheless discounted Emerson's subjective pain complaints, opining that they were not entirely consistent with objective evidence that reflected an improvement in Emerson's overall condition (with surgical intervention) since the denial of his initial applications for benefits in 2012. (Id. at p. 18).

The ALJ likewise discounted a physical limitations assessment completed by Emerson's physician, Dr. Stuart Smith, on the grounds that it was not supported by the overall record. (Id. at p. 20). In so doing, the ALJ accepted Emerson had some variability in physical functioning during

the period under consideration but hastened to add that Emerson (1) had not experienced a full 12-month period in which he fell below the baseline RFC, and (2) had actually experienced a improvement in his condition such that, at time of his hearing on May 25, 2017, he appeared capable of engaging in activities in excess of his RFC. (Id.).

The ALJ then segued into a discussion of Emerson's work history. (Id. at 21). The ALJ did not consider daycare worked performed by Emerson following his alleged onset to date to be substantial gainful activity. (Id.). He instead focused on Emerson's work as a salvage yard foreman, which he acknowledged that Emerson could no longer perform. (Id.).

At the fifth and final step of his analysis, the ALJ concluded there were exertionally sedentary and unskilled jobs existing in significant numbers in the national economy that Emerson was capable of performing given his age, education, work experience, and RFC. (Id. at p. 22).

> If the claimant had the residual functional capacity to perform the full range o flight work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations.
>
> The vocational expert testified that such an individual could work in elemental industrial jobs, which are exertionally sedentary and unskilled with SVP values of 2. The vocational expert also testified that the elemental industrial category comprises 87 codes in the Dictionary of Occupational Titles. The vocational expert identified some representative codes in this category such as assembler, eyeglass frames, 713.687-018, fishing reel assembler, 732.684-062, and stuffer of toy and sport equipment, 731.685-014. The vocational expert testified that the total number of elemental jobs in the regional jobs taking all codes together would be somewhat reduced by the sit/stand option as reflected in the residual functional capacity established above.

> Still, the vocational expert explained that, even with the sit/stand option set forth above, there would still be about 100,000 elemental industrial jobs in the national economy and about 1,400 in the region consisting of North Dakota, South Dakota, Minnesota, Iowa, and Nebraska.
>
> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is generally consistent with the information contained in the Dictionary of Occupational Titles. The vocational expert explained that the Dictionary of Occupational Titles does not address a sit/stand option as reflected in the residual functional capacity established above. However, he explained that elemental industrial jobs are typically performed at a bench with a stoop and would allow for the opportunity to get up while remaining on task as reflected in the established residual functional capacity. The vocational expert further explained that his responses were based on his education and experience, including a quarter-century of work as a vocational consultant . . . .
>
> Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

Consequently, he deemed Emerson "not disabled" and denied Emerson's applications for DIB and SSI. (Id.).

## II. APPLICABLE LAW

### A. Law Governing the Eligibility for Benefits

A claimant is considered disabled for purposes of the Act if he or she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. E.g., Hilkenmeyer v. Barnhart, 380 F.3d 441, 443 (8th Cir. 2004); Pearsall, 274 F.3d 1211, 1217 (8th Cir. 2001); see 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is

required to use the five-step sequential evaluation mandated by 20 C.F.R. §§ 404.1520(a)(4) and determine:

>   (1)   whether the claimant is presently engaged in a substantial gainful activity,
>
>   (2)   whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,
>
>   (3)   whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,
>
>   (4)   whether the claimant has the residual functional capacity to perform his or her past relevant work, and
>
>   (5)   if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Upon reaching the fourth or fifth steps, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945. The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id.; 20 C.F.R. §§ 404.1529 and 16.929. Claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. Pearsall v. Massanari, 274 F.3d at 1218.

Claimants have the burden of establishing disability at the first four steps. However, if

claimants establish that their impairment prevents them from performing their past work, the burden then shifts to the Commissioner at step five to demonstrate there are jobs in the national economy realistically suited to the claimants residual function capacity. Id. at 1219; Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998); 20 C.F.R. §§ 404.1520 and 416.920.

    **B.**    **Standard of Review**

Upon review of the entire record, the court can affirm, modify, or reverse the decision of the Commissioner, with or without remanding the case for rehearing. 42 U.S.C. § 405(g). To affirm the Commissioner's decision, the court must find that substantial evidence appearing in the record as a whole supports the decision. Id.; see also Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). As the Eighth Circuit has repeatedly stated, the "substantial evidence on the record as a whole" standard demands more rigorous review than the "substantial evidence" standard:

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009) (citing Wilson v. Sullivan, 886 F.2d 172, 175 (9th Cir. 1989)); see also Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." Id. The court may disturb an ALJ's decision only if the decision lies outside the available "zone of choice." Nicola v. Astrue, 480 F.3d 885, 886

(8th Cir. 2007) (citation omitted).  An ALJ's decision is not outside the "zone of choice" simply because a court might have reached a different result had it been the initial trier of fact.  Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole.  See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993).  The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide."  Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner.  The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner.  Ellis v. Barnhart, 392 F.3d at 993.

**III.    DISCUSSION**

Emerson initially takes issue with the weight or lack thereof given to his primary care physician's opinion by the ALJ in his September 19, 2011, decision.  Specifically, he asserts:

> The Administrative Law Judge's Notice of Decision dated September 19, 2011 claims that Dr. Stuart Smith's relationship to the claimant is unknown (Exhibit No. B1A, page 14 and 22) and therefor his opinion was given no weight.  A careful review of Matthews's medical records indicates several visits and referrals by Dr. Smith (Exhibit B3F, pages 6, 26, 37, 47, 52, 65, 67, 70, 71, 82, 122 and 128 of 132; Exhibit B4F, pages 22 of 39).  Such visits establish Dr. Smith's relationship to Matthew as his primary care physician and his report should have been given weight to the Administrative Law Judge's decision.

(Doc. No. 12).  He next challenges the ALJ's finding that he (Emerson) could walk and stand without assistance.  In so doing, he points to a physician's report stating that he requires a hand-held

12

assistive device (read: cane) to walk. Finally, he complains that the vocational expert and by extension the ALJ failed to identify or otherwise establish that there were any jobs he was capable of performing in the city where he is presently residing.

The Commissioner responds that Emerson's assertions regarding the ALJ's 2011 decision are irrelevant and that Emerson's failure to focus on and address the ALJ's 2017 decision may be construed as a waiver of any argument that it lacks substantial support. Alternatively, the Commissioner maintains there is substantial evidence in the record to support the ALJ's 2017 decision.

The court agrees with the Commissioner that the weight or lack thereof assigned to Dr. Smith's opinion by the ALJ in 2011 has no apparent relevance in the context of the instant action. Emerson initiated this action seeking review of the ALJ's 2017 decision, not the ALJ's 2011 decision. His alleged onset of disability date in the context of this action is June 1, 2014, or approximately 32 months after the ALJ denied his initial applications for DIB and SSI in 2011. Consequently, his assertions regarding the ALJ's review of the medical record is immaterial to the issue before this court–whether there is substantial evidence in the record to support the ALJ's 2017 decision.

Having reviewed the record, the court finds that there is substantial evidence in the record to support the ALJ's RFC determination and final decision regarding Emerson's ability to perform sedentary work. The record belies Emerson's assertion that the ALJ gave short shrift to Emerson's use of a cane  Rather, it evinces that the ALJ considered Emerson's testimony regarding his diminished ability to walk despite using a cane and then endeavored to reconcile this testimony with the objective medical evidence that reflected Emerson's condition had generally improved following

surgical intervention.

Although Emerson complained of left arm, neck, and back pain, progress notes consistently reflect benign findings. These findings include a normal range of motion in Plaintiff's neck, shoulders, and back, as well as intact neurological findings. (Doc. No. 10-8 at pp. 38-41, 57-59; Doc. No. 10-10 at p. 8; Doc. No. 10-12 at p. 72). Progress notes dated May 16, 2016, further reflect that, after undergoing neck and back surgery, Emerson had reported that the pain in his left leg and arm was gone, that the pain in his back improved by forty-to-fifty percent, and headaches had improved since starting "tompirimate." (Doc. No. 10-12 at p. 23-24). Progress notes dated July 14 and 28, 2016, and August 11, 2016, indicated that, with respect to his gate, Emerson had "a normal ability to maintain motion and position and that Emerson had "normal muscle strength and tone with no atrophy or abnormal movement." (Id. at pp. 39, 44, and 49). Progress notes dated August 29 and December 23, 2016, indicate that his back pain had been waxing and waning and was at a four but that he was "satisified and functioning with the use of his current pain management medication and treatment plan." (Id. at p. 57-58, p. 74, 75).

Progress notes aside, the record reflects that Emerson worked part-time as a childcare provider/supervisor in an afterschool program during much of the adjudicated period. (Docs. 10-2 at 15; 10-5 at 23-24.). Although this part-time work does not constitute substantial gainful activity, the engagement in such work arguably bolsters the ALJ's assessment of Emerson's residual function capacity when viewed in conjunction with the medical records and the observations of medical sources. See Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011) ("Medical records, physician observations, and the claimant's subjective statements about his capabilities may be used to support the RFC.").

Notably, Emerson does not take issue with the hypothetical posed by the ALJ or the vocational expert's responses. Rather, he complains that neither the ALJ nor the vocational expert were able to demonstrate the kinds of jobs he was deemed capable of performing exist locally. The court appreciates Emerson's frustration. However, the reality is that all is required of the vocational expert and ALJ is to demonstrate or establish the existence of jobs in the national economy that Emerson could perform opposed to the existence of such jobs in the specific community that Emerson calls home.

As noted above, the Commissioner carries a burden of going forward with evidence of non-disability. At the fifth and final step of the sequential evaluation process. This burden is satisfied when the vocational expert identifies a significant number of jobs in the national economy that the plaintiff could still perform.

"Work which exists in the national economy" is defined as "work which exists in significant numbers either in the region where [plaintiff] lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). "Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [plaintiff is] able to meet with [plaintiff's] physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). In determining what constitutes a significant number of jobs, a reviewing court should apply a common sense standard to the facts in each individual plaintiff's case. Hall v. Bowen, 837 F.2d 272, 275 (6th Cir., 1988). Some of the criteria the court may consider include: the level of plaintiff's disability; the reliability of the vocational expert's testimony; the reliability of the plaintiff's testimony; the distance plaintiff is capable of traveling to engage in the assigned work; the isolated nature of the jobs; and the types and availability of such work. Id.

The record reflects that the vocational expert identified jobs that a hypothetical individual with Emerson's limitations could perform. (Doc. No. 10-2 at pp. 60, 61). He then went on to identify a number of such jobs both nationally and in the tri-state region of North Dakota, South Dakota, Minnesota, Iowa, and Nebraska. (Id.). Regrettably for Emerson, this is sufficient for purposes of the Social Security Act.

### IV.   CONCLUSION

In this case, the ALJ correctly applied governing SSA law, regulations, and policy guidance, and there is substantial evidence supporting the Commissioner's decision. As long as there is substantial evidence supporting the decision, this court may not reverse it simply because there is substantial evidence supporting a contrary outcome or because the court would have decided the case differently. Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001). Accordingly, the Commissioner's Motion for Summary Judgment (Doc. No. 18) is **GRANTED**, Emerson's Motion for Summary Judgment (Doc. No. 12) is **DENIED,** and the Commissioner's decision is **AFFIRMED.**

**IT IS SO ORDERED.**

Dated this 2nd day of December, 2022.

*/s/ Clare R. Hochhalter*
Clare R. Hochhalter, Magistrate Judge
United States District Court